IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GLORIA PETERSON,

     Plaintiff,         CV-06-1828-ST

   v.             OPINION AND ORDER

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF OREGON,
dba TriMet, a municipal corporation,

       Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Gloria Peterson ("Peterson"), originally filed this action against her former

employer, defendant Tri-County Metropolitan Transportation District of Oregon ("Tri-Met"), in

Multnomah County Circuit Court on October 16, 2003, *Peterson v. Tri-County Metropolitan*

*Transportation District of Oregon*, Civil Case No. 0310-11189. After Peterson filed a Second

Amended Complaint alleging, among others, a claim for violation of the Family and Medical

Leave Act, 29 USC § 2615 ("FMLA"),Tri-Met removed the case to this court.

1 - OPINION AND ORDER

This court has original jurisdiction over the federal statutory claims under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC § 1367(a).  Both parties have consented to entry of final judgment by a Magistrate Judge in accordance with FRCP 73 and 28 USC § 636(c).

At this point, all claims except the FMLA claim have been dismissed.  Tri-Met has filed a motion for summary judgment (docket #36) against the sole remaining FMLA claim.  For the reasons that follow, that motion is granted as to the third specification and denied as to the first and second specifications of FMLA interference.

## PROCEDURAL HISTORY

Peterson originally filed this action in Multnomah County Circuit Court in October 2003, alleging four claims for relief:  (1) failure to reinstate following a compensable injury in violation of ORS 659A.043; (2) workers compensation discrimination in violation of ORS 659A.040; (3) intentional infliction of emotional distress ("IIED"); and (4) "Unreasonable Interference by Tri-Met with Plaintiff's Work Performance."  In March 2004, Peterson filed a First Amended Complaint which eliminated the last claim and alleged a violation of ORS 659A.046 as an additional basis to support the first claim.

Peterson also filed a separate administrative workers compensation claim and in August 2004, obtained an abatement of the state court case pending the outcome of the workers compensation proceeding.  About six months later, on March 7, 2005, the administrative law judge ("ALJ") denied Peterson's workers compensation claim.  The Workers Compensation Board affirmed that ruling on September 7, 2005.  Toran Aff., ¶ 4 & Ex. 3, p. 1.  Peterson did not seek judicial review in the Oregon Court of Appeals, and the order became final.  *Id* at ¶ 5.

On August 1, 2006, the state court removed Peterson's case from inactive status.  *Id* at ¶ 6 & Ex. 4, p. 3.  Peterson also obtained new counsel and filed a Second Amended Complaint on December 12, 2002, adding two claims for relief under the FMLA.  The First Claim for violation of the FMLA is based on three separate specifications:  (1) failure to reinstate on March 22, 2002; (2) discharge on June 30, 2002; and (3) failure to hire for another position in October 2002.  Second Amended Complaint, ¶¶ 23-24.  The Second Claim remained a workers compensation cause of action, but invoked only ORS 659A.040 as the statutory basis for that claim.  *Id* at ¶¶ 25-26.  The Third Claim for IIED also carried over.  The Fourth Claim alleged another violation of the FMLA based on the failure to select Peterson for another position in May 2006.  *Id* at ¶¶ 30-32.

Based on the newly filed federal claims, TriMet filed a Notice of Removal to this court in December 2006.  In January 2007, TriMet moved to dismiss the Third Claim (IIED) which Peterson conceded.  *See* Minute Order dated January 29, 2007 (docket #12).  At oral argument on this motion, Peterson voluntarily dismissed her Second and Fourth Claims.  This leaves only the First Claim in the Second Amended Complaint as subject to TriMet's motion for summary judgment.

## PRELIMINARY ISSUES

As an initial matter, the parties raise several preliminary issues which significantly affect any ruling on Tri-Met's motion.  Thus, this court will first consider those issues, both of which center on Tri-Met's assertion that it was Peterson's difficult personality – and not the fact that she took FMLA leave – that drove the decision to eliminate her job and to not hire her for another position.

## I. __Factual Findings in Workers Compensation Proceeding__

Tri-Met argues that the ALJ's findings of fact in Peterson's workers compensation proceeding must be given preclusive effect.  Without specifying the exact "facts" to be given preclusive effect, Tri-Met quotes the bulk of the ALJ's decision, contending that Peterson's "personality issues and personality factors" caused the "communication problems" that Tri-Met asserts ultimately resulted in elimination of Peterson's job.

The difficulty with Tri-Met's approach is that the ALJ did not actually made the findings relied on by Tri-Met.  The ALJ found that:  (1) Peterson's beliefs that her co-worker, Laura Pliska, was "out to get her," that she was denied training, and that her coworker (Larry Nothwang) was being harassed by her immediate supervisor (Lynda Reed) were not well founded and, therefore, Peterson failed to establish that the employment conditions allegedly producing her mental disorder "exist[ed] in a real and objective sense" (Toran Aff., Ex. 1 ("ALJ Decision"), p. 4); and (2) Peterson failed to show that her diagnosis of a mental disorder was "generally recognized in the medical or psychological community" (*id* at 4-5).

Tri-Met does not seek to give preclusive effect to either of these findings.  Instead Tri-Met asks this court to conclude that Peterson was the cause of her difficulties at work and that Tri-Met based its layoff decision on those difficulties.  However, those factual findings are nowhere to be found in the ALJ's decision.

Peterson also contends that the workers compensation decision has no preclusive effect because it was decided under a different evidentiary standard.  *See Wilcox v. First Interstate Bank*, 815 F2d 522, 531 (9th Cir 1987) (findings under clear and convincing standard do not support issue preclusion under preponderance of the evidence standard).  The ALJ decision

applied a clear and convincing evidence standard.  ORS 656.802(3)(d); ALJ Decision, p. 4.  In

contrast, Peterson must prove her FMLA claim by a preponderance of the evidence.  However,

TriMet is not arguing that Peterson's FMLA claim is legally precluded because she failed to

prove in her workers compensation proceeding that her alleged mental disorder arose out of and

in the course of her employment.  Instead, TriMet seeks to apply issue preclusion to other factual

findings by the ALJ.  Since the ALJ did not make the particular factual findings relied upon by

Tri-Met, this court need not address the applicability of issue preclusion.

## II.  Statements by Peterson

Next, Tri-Met urges that Peterson's own testimony sounds the death knell for her claims.

At Peterson's deposition, Tri-Met asked Peterson if she was "implying" that she was laid off

because she "approached manager Don Haas regarding Ms. Pliska's lack of cooperation and

constant interference."  Peterson Depo., p. 175.  Peterson responded "no . . . I believe I was laid

off due to the year's worth of conflict," and answered "yes" when asked whether "it was really

the personality issues between you, Ms. Pliska, and Ms. Reed?"  *Id*.

However, at another point in her deposition, Peterson responded that she believed she

was laid off  because she took FMLA leave.  *Id* at 6 ("I believe that I was laid off because of my

workers' compensation claim and FMLA running concurrently") & 7 ("Because I took FMLA").

Therefore, the portion of Peterson's testimony cited by Tri-Met can reasonably be interpreted as

Peterson's understanding of why TriMet claims it terminated her, while Peterson believed, to the

contrary, that the actual reason was her use of medical leave.  In any event, Peterson has no first-

hand knowledge or information from any source as to why TriMet laid her off.  Therefore, her

explanation cannot be construed as a binding admission that defeats her FMLA claim.  She is

still permitted to attempt to develop evidence from which it may be inferred that TriMet

discharged her because she took FMLA leave, rather than because of personality issues as

claimed by TriMet.

### III.  Statement by McAuley

Peterson seeks to admit a statement made to her by K.C. McAuley ("McAuley"), an

Administrative Specialist for TriMet's Information Systems ("IS") department.  McAuley told

Peterson that she was privy to information that another employee had been slated for layoff, but

that Peterson had been chosen instead because she was out on medical leave.  According to

Peterson, "Casey [sic] had told me that Sheila Bernson's position was slated to be cut, but

because I went off on FMLA, Don [Haas] had decided to cut my position."  Peterson Depo.,

p. 129.  McAuley told Peterson that she saw a "document" stating that Bernson's position was

being cut, but did not tell her what it was or who had signed it.  *Id* at 131.

McAuley reported directly to Don Haas ("Haas"), manager of the IS Department and

Peterson's supervisor, and her job included taking minutes at regular weekly managerial

meetings at which layoffs were discussed.  Haas Depo., pp. 24-28; McAuley Depo., pp. 7-8.

TriMet contends that because McAuley was not a management employee, her statement to

Peterson is inadmissible hearsay.

Peterson's testimony consists of two statements, one made by Haas to McAuley and one

made by McAuley to Peterson.  To avoid a double hearsay problem, each of these two

statements must be separately admissible.  *See* FRE 805.  Haas' statement to McAuley is not

hearsay to the extent that it is not offered for the truth of the matter asserted, but is offered only

to prove Haas' motive or state of mind, namely why he decided to lay off Peterson.  However,

what McAuley told Peterson is offered for the truth of the matter asserted, namely that Haas made the remark to her.  As a result, it can only be admissible as nonhearsay or as a hearsay exception.

Peterson argues that McAuley's statement is not hearsay because it is an admission of a party opponent.  Under FRE 801(d)(2)(D), a statement "is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. . ." To introduce such evidence, Peterson must show that McAuley's statement concerned matters within the scope of her employment and was made during the existence of the employment relationship.  *N. Pac. Ry. v. Herman*, 478 F2d 1167, 1171 (9th Cir 1973).  McAuley was an employee of TriMet when she made the statement at issue.  Thus the only issue is whether her statement concerned matters within the scope of her employment.

The proffering party must "lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment."  *Breneman v. Kennecott Corp.*, 799 F2d 470, 473 (9th Cir 1986) (citation omitted).  As the proponent of the evidence, Peterson has the burden to demonstrate this foundational requirement.  *United States v. Chang*, 207 F3d 1169, 1176 (9th Cir 2000).

McAuley had no managerial or policy-making responsibilities, but was a support person who recorded decisions made by others and who lacked authority to communicate the results of those decisions to those affected by them.  The minutes kept by McAuley of a managerial-level meeting discussing Peterson's layoff would be admissible against TriMet as a business record or admission.  Similarly, no hearsay problem would prevent McAuley from testifying that she heard

first-hand a statement about Peterson made by Haas who had decision-making authority.  *See*

*Zaken v. Boerer*, 964 F2d 1319, 1323 (2nd Cir), *cert denied*, 506 US 975 (1992) (supervisor's

statement within scope of employment was admissible when testified to by employee who heard

the statement made).  Here, in contrast, Peterson seeks to admit her testimony of McAuley's

statement as to what Peterson's supervisor (Haas) said or did.  As a result, TriMet contends that

McAuley's statement to Peterson does not qualify as an admission by TriMet because it was not

made in the scope of her authority.  This court agrees.

The Ninth Circuit has not addressed whether a statement by a co-worker relating to an

alleged statement by a supervisor with decision-making authority concerns a matter within the

scope of the co-worker's employment.  "Other circuits to reach the issue, however, uniformly

have determined that such statements are not within the scope of employment when the declarant

neither is the plaintiff's supervisor nor has a significant role in the employment decision at

issue."  *Evans v. Port Auth. of N.Y.*, 192 F Supp2d 247, 263 (SDNY 2002) (footnote collecting

cases omitted).  This is consistent with the Seventh Circuit refusing to "read into the rule a

generalized 'personal involvement' requirement," but also recognizing that "not everything that

relates to one's job falls within the scope of one's agency or employment."  *Williams v.*

*Pharmacia, Inc.*, 137 F3d 944, 951 (7th Cir 1998).  As a result, the Seventh Circuit held that

complaints voiced by co-workers about their jobs and supervisors were not admissible to prove a

pattern and practice of discrimination since "there was no evidence that any of the five women

were privy to or participated in Pharmacia's decisions affecting them."  *Id.*

McAuley participated in the managerial meeting concerning Peterson's layoff in the

sense that she attended and recorded the minutes of the meeting.  However, her participation was

neither significant nor instrumental to the decision-making process.  As far as the record reveals, she was not asked for her advice or input.  Similarly, conveying the substance of Haas' decision to Peterson was not necessary to its execution or otherwise within the scope of McAuley's job duties.  Because McAuley's statement to Peterson concerned matters outside the scope of her employment, Peterson's testimony concerning that statement is not admissible evidence.

**IV.  <u>Spoliation of Evidence</u>**

Peterson asks this court to draw an adverse inference from TriMet's destruction of evidence relevant to this case.  If a party notices and proceeds to destroy evidence relevant to litigation, then the court must view that evidence and the inferences arising from it in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F3d 1194, 1197 (9th Cir 1996).

Peterson filed her Complaint on October 16, 2003, and propounded her first request for production of documents on June 30, 2004.  From early to mid 2004, a TriMet employee was ordered to destroy computer backup records.  Included among those destroyed records were all of the emails and correspondence with Peterson left behind when she went out on medical leave, as well as any other documents relating to the budget cuts and layoff decisions during 2002.  As a result, TriMet has produced no documents originating from Haas or corporate communications regarding the budget cuts or layoff decisions and very few other documents responsive to Peterson's discovery requests.

However, TriMet has submitted evidence that it began destroying outdated mainframe reel-to-reel tapes in 2004 for two reasons:  (1) to reduce storage costs of up to $4,000 per year (English Depo., p. 13); and (2) because it can no longer read the data on those tapes (*id* at 16; Fouts Depo., pp. 12-13).  In addition, the decision to destroy the unusable tapes was not made by

anyone who had anything to do with Peterson and included all tapes five years or older. English Depo., p. 12. The evidence does not support drawing any adverse inference based on TriMet's intentional destruction of evidence that could be probative to Peterson's case.

## UNDISPUTED FACTS

A review of the materials submitted by the parties, including affidavits, declarations, and deposition excerpts, reveals the following facts viewed in the light most favorable to Peterson:

Peterson began full-time employment with TriMet in 1978 as an information clerk in the Marketing Department. She then rose through the clerical and administrative ranks to the position of Oracle Business Systems Analyst II in the IS Department on June 1, 1999. That position was subsequently upgraded on August 7, 2000, to Systems Analyst/Programmer IV. Peterson's job responsibilities required application of the Oracle financial software that controlled TriMet equipment, purchasing and accounting. Her immediate supervisor and the lead project manager was Lynda Reed ("Reed"), a Systems Analyst/Programmer V. Also included in Peterson's work group was Laura Pliska ("Pliska").

Peterson performed well for awhile in the IS Department. In her annual evaluations, Peterson received a "Meets Goals" in 1999, an "Exceeds Goals" in 2000, and a "Meets Goals" in 2001. Toran Aff., Ex. 8. In her 2001 performance evaluation, however, Haas documented Peterson's "continuing set of inter-personal and communication problems experienced with her immediate peer group." *Id* at 5.

AT issue in this case is what happened between the 2000 "Exceeds Goals" evaluation and the situation at the end of 2001. According to Peterson, while the group as a whole was focusing

on business-related issues, she felt excluded and, more significantly, became concerned about her prospects for continued employment in the IS Department.

In December 2000, Peterson reported to Haas that:  (1) Reed had confided some personal details of Reed's home life with her children; (2) Pliska allegedly had interfered with Peterson's training opportunities; and (3) Reed and Pliska had harassed a co-worker (Larry Nothwang).  *Id*, Ex. 31, pp. 2-3.  By the end of January 2001, Pliska's status was changed from a contractor to an employee.  *Id* at 5.  In February 2001, Reed angrily told Peterson that she had rehired Pliska and probably would not be able to continue to keep Peterson "on the technical side."  *Id* at 4. Peterson interpreted Reed's comment to mean that she was going to be required to go back to her old job in Maintenance.  *Id*, Ex. 32, p. 2.  Peterson then became concerned that the information she had conveyed to Haas would not remain confidential, that Reed and Pliska were angry with her, and that Pliska would try to force her out because Pliska had lost her lucrative contract with TriMet. *Id*, Ex. 31, pp. 5-8.

In February 2001, Peterson confronted Reed and, according to Reed, yelled at her, telling her that she was, in essence, a horrible person and bad supervisor.  *Id*, Ex. 11, p. 2 & Ex. 18, pp. 4-5.  Peterson also complained to Haas that Reed was not supportive of her effort to obtain training and that Pliska was "hateful towards her and withheld information from her."  *Id*, Ex. 11, p. 3.

Haas enlisted the help of Human Resources ("HR") which retained a mediator to try to help resolve the group's problems.  *Id*, Ex. 9, p. 2, & Ex. 25, p. 19.  Mediations were held from March through July 2001, but were unsuccessful.  *Id*, Ex. 10, pp. 2-4.  Peterson felt that during this process and through December 2001, Haas constantly criticized her.  *Id* at 5-7.

By email dated November 16, 2001, Peterson advised Haas that she was not able to sleep, was sick to her stomach, and discussed the stress at work with her family physician. Plaintiff's Ex. 6. She also stated that her physician "offered to provide time off for me and I am actually considering a stress claim at this time." *Id*.

In light of the untenable situation, Haas discussed some options with Peterson. Toran Aff., Ex. 33, p. 2. One option was to return Peterson to her prior union position in Maintenance, which Peterson refused. *Id*. Another option was for Peterson to learn to get along in the group. *Id.* On December 3, 2001, after it became apparent to Haas that Peterson either would not or could not meet the second option, Haas contacted HR to determine what Peterson's "fallback rights" were under the labor agreement. *Id*, Ex. 12. Fallback rights guarantee that a former represented worker who is leaving a non-union position due to layoff can return to the last held union position. *Id*, Ex. 13, p. 2.

After the December 2001 performance evaluation, Haas and Peterson agreed to make the review a topic of the upcoming mediation. *Id*, Ex. 19, pp. 5-6. However, Peterson was very upset when she left that meeting on December 12, 2001, which worried Haas. *Id*, Ex. 7, p. 6.

On December 18, 2001, after consulting with her doctor, Peterson submitted a workers compensation claim for work-related stress beginning December 12, 2001. *Id*, Ex. 14. Haas told Peterson that he was angry that she had filed a workers compensation claim and that they should let the attorneys handle it. Plaintiff's Ex. 2, p. 8. Peterson was then locked out from the use of her computer. *Id*, Ex. 2, p. 9. TriMet denied Peterson's workers compensation claim on January 11, 2002 (*id*, Ex. 1, p. 3), and that denial subsequently was upheld at each level of administrative review. Because Peterson's workers compensation claim was denied, her time

off after December 12, 2001, was counted as FMLA leave with a return to work date of March

12, 2002, upon her submission of the proper paperwork.  Toran Aff., Ex. 27.  TriMet received

Peterson's FMLA request on February 18, 2002.  *Id*, Ex. 16.

　　　　As of January 21, 2002, Peterson's doctor authorized Peterson to "return to work full

time with the only medical restriction of not returning to her previous information systems

position" to avoid working with Reed and Pliska.  *Id*, Ex. 28.  TriMet viewed that letter as a

release to return to work and asked Peterson to return to work.  Plaintiff's Ex. 12.  When

Peterson indicated that she was still on FMLA leave, TriMet wrote her a letter dated February 4,

2002, advising that her failure to return to work by February 19, 2002, would be treated as a

voluntary resignation unless she submitted new information that her absence qualified for

FMLA.  *Id*.  Shortly after that, Haas told Peterson that she should return to work as soon as

possible because decisions were being made regarding layoffs.  Peterson Decl., ¶ 12.

　　　　After re-examining Peterson on February 8 and reviewing TriMet's January 24 and

February 4 letters, Peterson's doctor clarified to TriMet by letter dated February 9, 2002, that

Peterson was only released for duty to an alternate job.  Toran Aff., Ex. 22.  After receiving a

another letter and consultation report by another doctor dated January 21, 2002, Peterson's

doctor wrote another letter to TriMet on March 1, 2002, releasing Peterson to work on March 13,

2002, and requesting "that all parties involved make reasonable accommodation to allow her to

continue in the [IS] Department, but ideally with different co-workers and immediate supervisor

and different physical area."  *Id*, Ex. 23, pp. 2-3.  TriMet felt that this letter "raised several issues

about [Peterson's] ability to successfully return to work."  Toran Aff., Ex. 23; Plaintiff's Ex. 13.

As a result, TriMet scheduled a meeting with Peterson's doctor on March 19, 2002, to discuss those issues.  Plaintiff's Ex. 13.

In a telephone conversation on March 11, 2002, TriMet's Director of Employee Relations, Carol Jolly ("Jolly"), advised Peterson that TriMet needed another couple of weeks to "further delve into the situation."  Toran Aff., Ex. 24, p. 1.  Jolly further offered to arrange to place Peterson on "paid administrative leave for at least the next two weeks" to which Peterson agreed.  *Id.*  In that same conversation, Jolly also told Peterson that her position was "one of the jobs listed for elimination" in the next few weeks, that she could return to her union job if she chose to do so by June 14, and that those with eliminated jobs would be placed on salary continuation through June 28.  Toran Aff., Ex. 24, pp. 1-2.  Jolly confirmed this conversation in a letter dated March 11, 2002, stating that Peterson "will be placed on paid administrative leave effective March 12 until further notice" and that her position "is one of those that will be eliminated as a result of this workforce reduction."  Plaintiff's Ex. 13.

Peterson's job was one of a number of positions listed on March 26, 2002, for layoff. Toran Aff., Ex. 26.  TriMet laid off Peterson from her job on March 11, 2002, with an effective date of June 30, 2002.  The final workdays for all the other employees affected by the RIF ended around the same time as did Peterson in March 2002 with salary continuation until the end of the fiscal year.  *Id.*

According to Haas, the decision to eliminate Peterson's position due to the budget cuts made business sense because the group acrimony threatened the completion of its project.  *Id*, Ex. 33, pp. 3-4.  He felt that Pliska and Reed had the skills and desire to make the project work.

*Id*.  He could not find a match for Peterson's skills in another spot in IS.  *Id* at 4-5.  He also laid off two other employees in that same time frame.  *Id* at 5.

Haas asked Reed whether she and Pliska could absorb all the job duties performed by Peterson.  *Id*, Ex. 18, p. 2.  Reed thought that because the majority of the work was finished, they could.  *Id*.  After Peterson was laid off,  "it actually seemed easier because we didn't have to tiptoe around on eggshells and worry about personalities, and we were able to sit down and get the job done."  *Id* at 3.

On July 1, 2002, Peterson returned to her former union job as an Inventory Control Specialist in the store room supervised by Andrea Dodson ("Dodson").  In the last week of June 2002, Dodson told Jeff Draper ("Draper"), Peterson's friend and longtime supervisor in the Maintenance department, to make sure to give FMLA papers to Peterson "because her manager Don Haas was in the process of termination due to excessive lost time."  Plaintiff's Ex. 3, pp. 2-4.

On August 9, 2002, TriMet posted a Systems Analyst/Programmer IV position.  Peterson applied for that position, but TriMet rejected her application on October 21, 2002.

## <u>ANALYSIS OF FMLA CLAIM</u>

## I.    <u>Legal Standard</u>

The FMLA creates two interrelated, substantive rights: "first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave."  *Bachelder v. Am. West Airlines, Inc.*, 259 F3d 1112, 1122 (9th Cir 2001).  With respect to the first substantive right, the FMLA allows eligible employees to take leaves of absence up to 12 weeks under various

circumstances.  29 USC § 2612(a).  It is undisputed that Peterson was an eligible employee, that

TriMet was an employer covered by the FMLA, and that Peterson took FMLA leave. With

respect to the second substantive right, the FMLA provides that "any eligible employee who

takes leave . . . shall be entitled, on return from such leave –  (A) to be restored by the employer

to the position of employment held by the employee when the leave commenced; or (B) to be

restored to an equivalent position . . . ."  29 USC § 2614(a)(1).  However, this provision "shall

[not] be construed to entitle any restored employee to . . . any right, benefit, or position of

employment other than any right, benefit, or position to which the employee would have been

entitled had the employee not taken the leave."  29 USC § 2614(a)(3).  It is undisputed that

Peterson would have been able to return to work before using her 12 weeks of FMLA leave had

her job not been eliminated.

　　　　To enforce these substantive rights, employees may bring an action for damages under 29

USC § 2617(a).  Two theories for recovery on FMLA claims are available.   An employee may

bring an "interference" claim under 29 USC § 2615(a)(1) which makes it "unlawful for any

employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right

provided" by the FMLA.  In addition, under either 29 USC § 2615(a)(2) or 29 USC § 2615(b),

an employee may bring a "discrimination" or "retaliation" claim against an employer for

opposing any practice made unlawful by the FMLA or for instituting or participating in any

FMLA proceedings or inquiries.  In the Ninth Circuit, "the anti-retaliation or anti-discrimination

provisions do not cover visiting negative consequences on an employee simply because he has

used FMLA leave."  *Bachelder*, 259 F3d at 1124; *see also Liu v. Amway Corp*., 347 F3d 1125,

1133 n7 (9th Cir 2003).  Peterson claims that TriMet eliminated her job because she was on

FMLA leave.  As a result, her claim is solely an "interference" claim under the FMLA.

To prevail on an "interference" claim, the employee "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her." *Bachelder*, 259 F3d at 1125.  Once an employee has made this showing, liability attaches to the employer for a violation of the FMLA.  Thus, to survive summary judgment, Peterson must submit evidence that would allow a factfinder to conclude that TriMet considered Peterson's leave as a negative factor in eliminating her job as a Systems Programmer/Analyst IV.  Had TriMet laid off Peterson even if she had not taken FMLA leave, then Peterson is not entitled to be restored to her position of employment.

TriMet has submitted evidence that the elimination of Peterson's job took place in the context of a reduction in force necessitated by budgetary concerns.  Based on this evidence, TriMet contends that the record overwhelmingly supports the conclusion that the decision to eliminate Peterson's position was based on factors wholly unrelated to whether she was on FMLA leave.  After an exhaustive review of the record, this court agrees that Tri-Met is entitled to summary judgment on Peterson's third specification of FMLA interference, but not on her first and second specifications of FMLA interference.

## II.  First and Second Specifications

The first specification of the First Claim alleges that TriMet violated the FMLA by failing to reinstate Peterson to her former position at the time of her release to full duty on March 12, 2002.  Second Amended Complaint, ¶ 24.[1]  The second specification of the First Claim

---

[1]  Although paragraph 24 of the Second Amended Complaint alleges that TriMet failed to reinstate Peterson "to her former position at the time of her release to full duty on March 22, 2002," this is a typographical error.  As alleged in paragraph 16 and evidence by the record, Peterson was laid off on March 12, 2002.

alleges that TriMet violated the FMLA by discharging Peterson from her position as a

Programmer/ Analyst IV on June 30, 2002.  *Id*.

### A.    Overlap Between First and Second Specifications

On or about March 7, 2002, Tri-Met decided to eliminate Peterson's position as a

Systems Analyst/Programmer IV, purportedly due to economic conditions and budget

reductions.  Toran Aff., Exs. 25, 26, 29, 30.  The effective date of the reduction in force was June

30, 2002, resulting in Peterson's discharge from employment on that date.  *Id*, Ex. 30.   The only

reason evident in the record as to why Peterson was not reinstated to her former position as a

Programmer/Analyst IV and subsequently discharged is that TriMet eliminated the position as

part of a reduction in force.  Accordingly, these two specifications are based on exactly the same

conduct, namely the decision in early March 2002 to eliminate Peterson's position effective

June 30, 2002.

### B.    Burden of Proof

Peterson contends that the two specifications are not redundant because of the differing

burdens of proof.  She argues that for a failure to reinstate claim, in contrast to a discharge claim,

TriMet has the burden of proving that, despite the use of FMLA leave, she would not been

reinstated.

As one court has explained, "[t]he burden of proof issue is complicated when the plaintiff

alleges that she was deprived of the FMLA entitlement of reinstatement to the same or an

equivalent position because the FMLA does not absolutely protect an employee's reinstatement."

*Parker v. Hahnemann Univ. Hosp.*, 234 F Supp2d 478, 485 (D NJ 2002) (citation omitted).

Pursuant to 29 USC § 2614(a)(3), an employer may deny reinstatement if the employee would

have lost her job during the leave period even if she had been working.  Interpreting this

statutory provision, the Department of Labor has promulgated the following regulation:

> An employee has no greater right to reinstatement or to other benefits and
> conditions of employment than if the employee had been continuously
> employed during the FMLA leave period.  An employer must be able to
> show that an employee would not otherwise have been employed at the
> time reinstatement is requested in order to deny restoration to
> employment.  For example:
>
> (1)  If an employee is laid off during the course of taking FMLA leave and
> employment is terminated, the employer's responsibility to continue
> FMLA leave, maintain group health plan benefits and restore the
> employee cease at the time the employee is laid off . . . *An employer
> would have the burden of proving that an employee would have been laid
> off during the FMLA leave period and, therefore, would not be entitled to
> restoration.*

29 CFR § 825.216(a)(1) (emphasis added).

When first applying this regulation, the Eleventh Circuit held that "when an 'eligible

employee' who was on FMLA leave alleges her employer denied her FMLA right to

reinstatement, the employer has an opportunity to demonstrate that it would have discharged the

employee even if she had not been on FMLA leave."  *O'Connor v. PCA Family Health Plan,

Inc.*, 200 F3d 1349, 1354 (11th Cir 2000).  Later, citing *O'Connor*, the Eleventh Circuit squarely

placed the burden on the employer to prove that its decision to eliminate the employee's job was

unrelated to the employee taking FMLA leave.  *Parris v. The Miami Herald Publ'g Co.*, 216 F3d

1298, 1301 n1 (11th Cir 2000).  Following the Eleventh Circuit's lead, the Tenth Circuit similarly

treats the regulation as an affirmative defense and places the burden on the employer to mitigate

its liability by proving that the employee would have lost her job whether or not she took FMLA

leave.  *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F3d 955, 963 (10th Cir 2002); *followed

by Parker*, 234 F Supp2d at 487; *see also Blankenship v. Buchanan Gen. Hosp.*, 140 F Supp2d

668, 673 (WD Va 2001) ("the employer may avoid liability by showing, by a preponderance of the evidence, that the employee would not have otherwise been employed at the time reinstatement was requested").

In contrast, the Seventh Circuit leaves the ultimate burden on the employee to "convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged or his position would not have been eliminated if he had not taken FMLA leave." *Rice v. Sunrise Express, Inc.*, 209 F3d 1008, 1018 (7th Cir), *cert denied*, 531 US 1012 (2000). It interprets the regulation "not as the agency's understanding as to Congress' allocation of the ultimate burden of proof in the litigation context, but as an explanation of the nature of the substantive right created by the statute." *Id.* The Ninth Circuit has not yet addressed this issue.

After considering the rationales presented for these competing approaches, this court concurs with the Tenth Circuit that the employer bears the burden of proof on this issue. First, the language of the regulation is not ambiguous. It explicitly states that the employer has the "burden of proving that an employee would have been laid off during the FMLA leave period." This regulation has been found valid by at least two courts. *Smith*, 298 F3d at 963 (finding regulation valid and "not arbitrary, capricious, or manifestly contrary to the FMLA"); *Duckworth v. Pratt & Whitney, Inc.*, 152 F3d 1, 5 (1st Cir 1998).

Second, it is noteworthy that the Seventh Circuit employs the *McDonnell Douglas Corp.* burden-shifting framework in analyzing FMLA "interference" claims, thus ultimately placing the burden of causation on the employee. In keeping with this framework, it reasoned in *Rice* that, because the FMLA precludes an employee who takes leave from bettering her position, she must

always bear the ultimate burden of establishing the benefit with which she claims her employer interfered. However, the Ninth Circuit has explicitly rejected use of the *McDonnell Douglas Corp.* burden-shifting framework for FMLA "interference" claims where intent to discriminate is not an issue. *Bachelder*, 259 F3d at 1125. Given these differing approaches, the Seventh Circuit's allocation of the burden of proof onto the employee is not persuasive.

Third, burdens of proof should "conform with a party's superior access to the proof." *Int'l Bhd. of Teamsters v. United States*, 431 US 324, 359 n45 (1977). The employer holds the evidence that is essential to the inquiry, namely "evidence about future plans for a position, discussions at management meetings, and events at the workplace during the employee's FMLA leave." *Parker*, 234 F Supp2d at 487 (citation omitted). Accordingly, this court concludes that TriMet bears the burden of proving that it would have eliminated Peterson's job even if she had not taken FMLA leave.

Contrary to Peterson's contention, this burden of proof does not differ between Peterson's failure to reinstate and discharge specifications because both are predicated on one and the same act by TriMet, namely the elimination of Peterson's job. The example given in 29 CFR § 825.216(a)(1), which places the burden of proof on the employer, specifically refers to an employee being laid off during FMLA leave, resulting in termination. That is precisely what Peterson claims in both her first and second specifications. She was laid off from her job on March 11, 2002, and given severance pay through June 30, 2002, the date of her termination. For both events, TriMet bears the burden of proving that it would have made the decision to lay off Peterson in early March 2002 even if she had not been on FMLA leave.

This does not mean that the entire burden of proof on the first and second specifications is shifted to TriMet.  To prevail, Peterson must still submit evidence that her taking of FMLA leave "constituted a negative factor in the decision to terminate her."  *Bachelder*, 259 F3d at 1125.  Requiring proof of a "negative factor" is another way of stating that there must be some causal connection between the FMLA right and the adverse employment decision.  In other words, Peterson has the burden of presenting sufficient evidence that, if found credible by the fact-finder and TriMet remains silent, would entitle her to judgment as a matter of law.

### C.    <u>Proof of a Negative Factor</u>

TriMet argues that Peterson's FMLA claim arising from the loss of her job is merely a creative, but fatally flawed, attempt to convert her workers compensation discrimination claim into an FMLA claim.  However, an exhaustive review of the record reveals sufficient evidence to support Peterson's theory that possible elimination of her job arose only after she suggested she might be filing a stress claim.  TriMet has a gaping hole in its documentary trail regarding the decision to eliminate Peterson's position.  Timed as it is just prior to Peterson's attempt to return to work and set as it is in that evidentiary vacuum, a factfinder could conclude that Peterson's use of FMLA leave indeed negatively factored in the decision to eliminate her position.

The record amply supports the conclusion that interpersonal problems were brewing between Peterson, her immediate supervisor (Reed), and her co-worker (Pliska).  Those difficulties had been ongoing throughout the fall of 2001 and ultimately culminated in Peterson taking leave starting on December 12, 2001.  However, Peterson communicated the possibility that she might take medical leave to Haas nearly a month earlier.  In her November 16, 2001 email to Haas, Peterson wrote:

> As far as next week goes I don't know at this time what I am going to do.  I spent most of last night wide-a-wake not being able to sleep and sick to my stomach.  Today is not much better and I am just exhausted.  I don't know if I will go through with my plans because I am not sure I am up to it at this time.  In the past I have talked with my family physician regarding the stress here at work and I plan to do that again this next week.  *He offered to provide time off for me and I am actually considering a stress claim at this time*.

Plaintiff's Ex. 6 (emphasis added).

Up until that time, Haas had indicated a willingness to work with Peterson to find ways to allow her to continue working within the IS Department.  But immediately after Peterson's November 16, 2001 email, Peterson started experiencing problems with Haas.  On December 2, 2001, he made critical comments on her annual performance review.  The next day Haas made an inquiry to HR about eliminating a "position held by someone who has bump back rights." Toran Aff., Ex. 12.

TriMet argues that this email precludes Peterson's FMLA claim because it shows that Peterson's job was slated for elimination prior to the time that Peterson officially filed her FMLA claim on February 18, 2002 (*id*, Ex. 16).  This argument is premised upon TriMet's position that Peterson's November 16, 2001 email to Haas alerted TriMet only to the possibility of a workers compensation stress claim, not to the possibility that Peterson might be taking leave protected under the FMLA.  TriMet too narrowly interprets Peterson's email.

The FMLA and its implementing regulations contemplate that an employee may give advance notice of the need to take leave and places the burden squarely on the employer to determine whether the leave request is likely to be covered by the FMLA.  *Bachelder*, 259 F3d at 1130-31.  While Peterson had not yet formally requested FMLA leave, her email clearly contemplates taking "time off" for a medical reason.  The fact that Peterson considered filing a

23 - OPINION AND ORDER

workers compensation stress claim does not negate the fair implication of her November 16, 2001 email to Haas.  A factfinder could reasonably conclude that this email constituted notice to TriMet of Peterson's need for medical leave which followed four weeks later.

In addition to the timing of Haas' email inquiring about eliminating the position of a person with bump back rights, the timing of the elimination of Peterson's position is also suspect.  Tri-Met characterizes the timing of that decision as purely coincidental to the timing of the end of Peterson's leave.  Her position was apparently eliminated on or about March 7, 2002, within a week of when her leave was scheduled to end.  Close temporal proximity between protected leave and a decision to eliminate a position may alone be enough to ward of summary judgment.  *See Reid v. Smithkline Beecham Corp.*, 366 F Supp2d 989, 998 (SD Cal 2005)**.**

Other evidence supporting Peterson is Haas' angry response when she filed her workers compensation claim.  Although a workers compensation claim is not the same as an FMLA claim, a reasonable factfinder could infer that Peterson's need for FMLA leave was a necessary corollary of her workers compensation claim, such that Haas's reaction related to the need for taking medical leave, whether it was covered by workers compensation or the FMLA.  Haas also advised Peterson to return to work before expiration of her FMLA leave because decisions were being made regarding layoff, raising the inference that her absence from work was a factor being taken into account.

TriMet also argues that Peterson's own doctor kept her from returning to work before the layoff on March 12, 2002.  Peterson's doctor initially released her to work on January 21, 2002, but not to her IS job.  Nevertheless, TriMet advised that she return to work on pain of dismissal unless she submitted new information that her absence qualified for FMLA.  At that same time, Haas urged Peterson to return to work because decisions were being made regarding layoffs,

providing a nexus between Peterson's FMLA leave and her possible layoff.  In addition, TriMet

continued to question the scope of the release provided by Peterson's doctor who wrote yet

another letter dated March 1, 2002, explaining that Peterson could not return to work on

March 13, 2002, with the same co-workers and supervisor.  Still TriMet required further

information from Peterson's doctor, set a meeting with him on March 19 to discuss those issues,

placed Peterson on paid administrative leave in the interim, and also told Peterson that her job

was listed for elimination.  These facts are sufficient to raise a question as to whether TriMet was

making decisions about Peterson's return to work based on her use of medical leave.

At this juncture, all reasonable inferences must be drawn in Peterson's favor and, based

on those inferences, a factfinder could reasonably conclude that Peterson's taking of leave was a

negative factor in TriMet's decision.  In response, TriMet has submitted evidence that Peterson's

layoff was pursuant to a reduction in force driven by budgetary concerns.  However, fact issues

preclude TriMet from satisfying its burden of proof that Peterson was not entitled to return to her

job.  As Peterson notes, the layoff was apparently not undertaken pursuant to some objective

methodology.  Moreover, the documents surrounding the decision to eliminate positions are not

available.  Creating yet an additional fact issue is Draper's testimony that Haas told Dobson that

Peterson was being terminated due to excessive lost time.  This testimony may be subject to

impeachment, but, if credited, supports Peterson's claim.

Based on this evidence, a genuine issue of material fact exists as to whether the

elimination of Peterson's job was inevitable regardless of the fact that she used FMLA leave.

Accordingly, TriMet's motion for summary judgment is denied against the first and second

specifications of the FMLA claim.

## III.    **Third Specification**

25 - OPINION AND ORDER

In her third specification, Peterson alleges that TriMet violated the FMLA by refusing to hire her for a position as a Programmer/Analyst IV in October 2002. Although this position had the same title as the position Peterson held at the time her job was eliminated, the undisputed facts reveal that it was quite different and that Peterson was not qualified for it.

From about 1995 through 2004, IS used a generic job description for programmer/analyst positions. Haas Aff., ¶ 2. The qualifications in that generic job description provided an exhaustive list of all possible skills needed in the majority of IS positions. *Id*, ¶ 2 & Ex. 3. However, applicants were screened for the set of skills required to do the specific job for which they were applying. *Id*, ¶ 2.

The State of Oregon Office of Medical Assistance Programs ("OMAP") contracted with TriMet to act as a broker to arrange rides for Medicare and Medicaid patients in the Tri-County area in Oregon. *Id*, ¶ 3. Through its Alternative Transportation Service ("ATS"), TriMet assigns patient rides to subcontractors who operate medical taxis and other appropriate forms of transportation. *Id*. OMAP reimburses TriMet for all costs incidental to the program. *Id*.

Due to an increase in patient rides per month, IS staff supporting the program increased correspondingly from a half a position to one and one-half positions. *Id*, Ex. 1. In May 2002, OMAP installed an upgraded software package to match patients to rides and create billing and moved the operation from DOS to a Windows application. *Id.,* ¶ 4 & Ex. 1. The new software required extensive testing and modification before being able to fully meet the program's needs. *Id,* Ex. 1. However, the software's creator did not have a qualified technician to correct many problems with the application and the software was in danger of faltering. *Id*, ¶ 4. Accordingly, by July 2002, OMAP agreed to fund a limited duration position at TriMet (for 18 months to two

years) to handle the "increased testing, documentation, user training and support of the new software."  *Id*, Ex. 1.

In August 2002, TriMet posted a limited term Systems Analyst/Programmer IV at ATS to address the OMAP software issues.  *Id*, ¶ 5 & Ex. 2.  The position was posted using the generic job description.  *Id*, ¶ 5 & Ex. 3.  Because of the nature of the problems with the software, Haas, as the hiring manager, was looking for a particular skill set that included visual basic, relational database, SQL Query and technical writing which would be the subject of supplemental testing for those applicants who progressed to the interview level.  *Id*, ¶ 5 & Ex. 4.

Peterson applied for the job, along with nearly 200 other internal and external applicants.  *Id*, ¶ 6.  However, she did not advance to the interview stage of the hiring process.  *Id*.  As explained by Haas:

> Although Ms. Peterson had held a job with the same title [as the one for which she was applying and which was posted with only the generic job description], Ms. Peterson was essentially a trainee and had been hired into her original IT position based [upon her] familiarity with and work experience within the Maintenance department at TriMet and her familiarity with Oracle Structured Query Language (SQL) report generation.

*Id*, ¶ 7.

Because she had no other information technology experience,  her job duties in that essentially training position "were limited to support of TriMet's Oracle financial applications," "did not require any programming or system design," and did not involve "high-level programming, data base design[,] or Internet development."  *Id*, ¶ 8 & Ex. 5.  Moreover, with only three years of IS experience in a support role, Peterson "had no experience developing and implementing application systems and no practical experience with the programming language and database used by the OMAP system."  *Id*, ¶ 10.

27 - OPINION AND ORDER

Against those minimal qualifications was a program that "needed immediate support and extensive repair to be viable." *Id*, ¶ 12. Hiring an inexperienced person who would need substantial training and time to become capable simply "was not a viable option." *Id*. In addition, the OMAP position "required excellent customer contact skills in a team-oriented environment" which Haas believed Peterson lacked. *Id*, ¶ 11.

The hiring team offered the successful candidate the position only after he had successfully completed programming and database specific testing and technical and management interviews. *Id*, ¶ 12. A comparison of Peterson's application (*id*, Ex. 5) with the resume of the successful candidate (*id*, Ex. 6) clearly reveals that the successful candidate had superior qualifications.

To prove that she was qualified for the job, Peterson relies solely on the minimum qualifications stated in the position announcement which were virtually identical to the minimum qualifications for the job she had held prior to her termination. However, as explained by TriMet, the position for which Peterson applied was not the same position that she had held and required skills which Peterson did not possess. Instead, TriMet hired an applicant who had far superior qualifications. Peterson has not submitted sufficient evidence that allow a factfinder to reasonably conclude that she was not hired for the position for any reason other than the merits of her application and past work experience and conduct.

In addition, the third specification does not benefit from a close temporal proximity between her invocation of leave rights and the adverse employment action. Unlike her layoff, which came near the conclusion of her leave period in March 2002, Peterson did not submit her application for the new position until August 12, 2002. That was a little over five months after she had been laid off from her IS position. To demonstrate discriminatory motive based solely

on timing considerations, "the temporal proximity must be 'very close.'" *Clark County Sch.*

*Dist. v. Breeden*, 532 US 268, 273 (2001) (citations omitted).  Periods of four and three months

have been held insufficient to establish the required nexus.  *Id* at 273-74; *also see Villiarimo v.*

*Aloha Island Air, Inc.*, 281 F3d 1054, 1065 (9th Cir 2002) (in a Title VII case citing to decisions

from other circuits that, standing alone, intervals of four months and five months were "too

long.").

As a result, TriMet is entitled to summary judgment against the third specification of the

FMLA claim.

## <u>ORDER</u>

For the foregoing reasons, Tri-Met's Motion for Summary Judgment (docket #36) is

GRANTED as to the third specification and DENIED as to the first and second specifications of

the First Claim (Second Amended Complaint).

DATED this 14th of March, 2008.

/s/ Janice M. Stewart____
Janice M. Stewart
United States Magistrate Judge